1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDOLPH FRANKLIN FATHEREE, | Case No.  1:13-cv-01577-SKO |
| Plaintiff, | **ORDER ON PLAINTIFF'S COMPLAINT** |
| v. | (Doc. 1) |
| CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security, | |
| Defendant. | |
| _____/ | |

## INTRODUCTION

Plaintiff Randolph Franklin Fatheree ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

**BACKGROUND**

Plaintiff was born in 1962, attended school through second grade and was home schooled until fifth grade, and is illiterate.  (Administrative Record ("AR"), 31.)  Plaintiff lives with his brother.  (AR 35.)  Plaintiff previously worked as a roofer and construction worker.  (AR 44.)

**A.      Relevant Medical History**

Plaintiff was admitted to the emergency room in February 2011 with upper abdominal pain.  (AR 205-08, 209-15.)   His physical examination was normal, but his computerized tomography ("CT") scan showed cholelithiasis and diverticulosis of the colon, with active inflammatory change.  *Id.*

In March 2011, Plaintiff was diagnosed with gallbladder disease and chronic obstructive pulmonary disease ("COPD") at Doctors Medical Center of Modesto.  (AR 262.)  Gallbladder surgery was postponed in late March 2011 because Plaintiff developed bronchitis.  (AR 247.)  Plaintiff reported a history of tobacco use, but indicated he no longer smoked, as well as a history of cocaine and methamphetamine use.  (AR 247.)

In April 2011, state agency reviewing doctor, Laura Lochner, Ph.D., completed a Psychiatric Review Technique form and noted Plaintiff's lay statement suggested a "possible mental impairment," but there was no evidence of a discrete mental impairment in the medical records; further analysis of Plaintiff's possible mental impairment was curtailed due to a lack of treatment for mental impairments.  (AR 232.)  Nevertheless, even if Plaintiff did suffer from a mental impairment, Dr. Lochner opined it did not result in any work-related functional limitations.  (AR 232.)   Dr. Lochner's opinion was affirmed in July 2011 by state agency reviewing psychologist P.Y. Klein, PsyD, who determined Plaintiff did not have a medically determinable mental impairment.  (AR 272-84.)

In April 2011, another state reviewing physician, Walter Bell, M.D., completed a Physical Residual Functional Capacity Assessment.  (AR 234-41.)    Dr. Bell assessed that Plaintiff's physical limitation included avoiding concentrated exposure to fumes, odors, dusts, gasses, and areas with poor ventilation.  (AR 238.)  Dr. Bell noted Plaintiff used a cane, crutches, and walker, none of which were prescribed by a doctor.  (AR 239.)  He concluded that Plaintiff had no

1    medically determinable condition.  State agency reviewing physician, J. Linder, M.D., affirmed

2    Dr. Bell's opinion that Plaintiff lacked medically determinable impairments except for the

3    environmental precautions against fumes, odors, gasses, and poor ventilation, in August 2011.

4    (AR 286-87.)

5         On May 2, 2011, Plaintiff underwent surgery to have his gallbladder removed and traverse

6    colon repaired.  (AR 245, 247-60, 261-65.)   Plaintiff's concurrent physical examination was

7    normal.  (AR 247.)

8          In May 2011, during examination at Stanislaus County Health Service Agency, Plaintiff's

9    straight leg raising ("SLR") test was negative, and his motor strength was 5/5 on the right and 4/5

10   on the left.  (AR 268, 318.)  In May and July 2011, Plaintiff reported chronic low back pain.  (AR

11   267-68.)  In July 2011, Plaintiff reported multiple aches and pains, his SLR test was positive on

12   the right and negative on the left, and he was prescribed ibuprofen and Vicodin.  (AR 267, 319.)

13        In September 2011, an X-ray of Plaintiff's spine showed marked degenerative changes and

14   some congenital deformities.  (AR 294.)  Plaintiff was diagnosed with COPD, low back pain, and

15   depression. (AR 317.)  In October, Plaintiff requested a refill of Vicodin for his back pain, and

16   reported his symptoms were unchanged.  (AR 313-14.)  A sleep study showed Plaintiff had a very

17   mild breathing disorder during sleep.  (AR 324.)   From December 2011 to February 2012,

18   Stanislaus County Health Service Agency treated Plaintiff's low back pain and depression.  (AR

19   312-13.)

20        In September 2011, Robert L. Morgan, Ph.D., administered a series of intelligence tests

21   using the Wechsler Adult Intelligence Scale IV ("WAIS-IV").  (AR 295-302.)  Plaintiff's scores

22   were 68 for Verbal Comprehension, 86 for Perceptual Reasoning, 80 for Working Memory, and

23   68 for Processing Speed, with a Full Scale IQ score of 71.  (AR 295-97.)  Dr. Morgan noted that

24   Plaintiff possessed a "unique set of thinking and reasoning abilities" that made his overall

25   intellectual functioning difficult to summarize with a single score on the WAIS-IV.  (AR 295.)

26   Dr. Morgan noted that while Plaintiff's verbal reasoning abilities were extremely low with a score

27   of 68, his nonverbal reasoning abilities were much better developed as reflected by his

28   significantly higher score of 86.  (AR 295-97.)

Dr. Morgan subsequently saw Plaintiff three times, in January, February, and March of 2012. (AR 303.) Plaintiff's older brother, Wayne Fatheree, with whom Plaintiff lived, accompanied Plaintiff and participated in the meetings with Dr. Morgan. (AR 303.) In a Comprehensive Psychological Evaluation dated March 23, 2012, Dr. Morgan reported Plaintiff was last employed in 2007, and had not worked since he was laid off. (AR 303.) Dr. Morgan reported that Plaintiff worked with sheet metal and air-conditioning, acting primarily as a "helper," with his brother and colleagues supervising his activities and providing instruction. (AR 303-04). Plaintiff did not make independent decisions or work by himself. (AR 304.) Previously, Plaintiff worked on an as-needed basis as a roofer from 1997-2006, primarily with his brother or brother-in-law, for different companies. (AR 305.)

Dr. Morgan reported that Plaintiff attended school until the second or third grade, then was home schooled until fifth grade. (AR 304.) Plaintiff could read simple things, but was functionally illiterate, and had difficulty concentrating and remembering. Plaintiff was arrested for petty theft as a young adult and for driving under the influence of alcohol in 1994. (AR 305.) Plaintiff lived with his brother, did not drive and could not pass the 18-question driver's license examination, and was unable to handle his finances. (AR 304.) He showered perhaps every three days. (AR 306.) Plaintiff had no friends, no children, was single, and had never married. (AR 304.) Plaintiff reported to Dr. Morgan that he did nothing all day and had no hobbies. (AR 304.)

Plaintiff suffered from depression and anxiety, and his memory was poor. (AR 304.) Plaintiff had thoughts of killing himself, but no plans to do so. (AR 304.) He felt he had failed as a person and his future was hopeless. (AR 304.)

Dr. Morgan reported that Plaintiff's back was injured in 1984 and he was subsequently diagnosed with degenerative disc disease. (AR 305.) Plaintiff had gained almost 100 pounds over the previous 18 months. (AR 306.) He previously used methamphetamines, but last used them three years prior in 2009. (AR 305.)

Dr. Morgan reported that Plaintiff's mental status examination showed him to be cooperative, with coherent, organized, and logical thought processes, and oriented to person, place and time. (AR 306.) He estimated Plaintiff's IQ was "average." (AR 306.) Plaintiff knew the

4

month and year, but not the day of the week; could remember 3 digits forward and 2 digits backwards; and could recall 1 of 3 items after five minutes.  (AR 307.)  He knew his date of birth, could name a number of past presidents, but was unaware of current events.  He could do simple adding and subtracting, but not multiplication.  (AR 306-07.)  He could perform abstract thinking, knew similarities and differences, and had good insight and judgment.  (AR 307.)

Dr. Morgan concluded that although Plaintiff had a Full Scale IQ score of 71, his Verbal Comprehension Index score of 68 suggested mild mental retardation.  (AR 307.)  In addition, Plaintiff's Perceptual Reasoning Index score of 86 suggested a learning disability, because his nonverbal abilities were so much better than his verbal abilities.  (AR 307.)  Dr. Morgan diagnosed Plaintiff with major depressive disorder and learning disability.  (AR 308.)

Dr. Morgan opined Plaintiff met Listing 12.05 for mental retardation and 12.04 for affective disorder.  (AR 308.)  He opined Plaintiff was moderately impaired in his ability to understand, remember, and perform simple one- to two-step tasks.  (AR 309.)  Plaintiff was markedly impaired in his abilities to deal with the public, maintain activities of daily living, maintain social functioning, and maintain concentration, persistence, and pace.  (AR 308-10.)  Plaintiff had a Global Assessment Function ("GAF") score of 50.[2]

In April 2012, Mr. Pete Thompson, LCSW, wrote a letter on Plaintiff's behalf.  (AR 311.)  Mr. Thompson reported Plaintiff received treatment for depression and childhood trauma at his office at Ceres Medical Office (part of Stanislaus County Health Services Agency), over thirteen sessions from April 2011 to April 2012. (AR 311.)  Mr. Thompson reported that while Plaintiff's short term memory impairment had increased in the previous year, Plaintiff had also suffered from memory problems for 17 years.  Plaintiff could not perform simple math, and could read with an early elementary school level proficiency.  (AR 311.)  Plaintiff did not attend school past third

---

[2] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnosis & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  The clinician uses a scale of zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations.  *Id.* at 34.  A GAF score between 41 and 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning.  *Id.*

grade because he did not feel safe.  Mr. Thompson did not think Plaintiff was capable of functioning adequately in any job, and diagnosed Plaintiff with post-traumatic stress disorder ("PTSD"), and mild mental retardation.  (AR 311.)  Mr. Thompson assigned Plaintiff a GAF of 44.

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on April 7, 2011, and again on reconsideration on August 24, 2011. (AR 68-71, 78-82.)  On April 10, 2012, Plaintiff appeared with counsel and testified before an administrative law judge ("ALJ").  Plaintiff's brother and a vocational expert ("VE") testified as well.  (AR 27-48.)

**1.      Plaintiff's Testimony**

Represented by counsel, Plaintiff testified at a hearing held on April 10, 2012.  (AR 27-48.)  Plaintiff's last job was at Modesto Air and Sheet Metal.  (AR 32.)  While working, Plaintiff's friend would show him how to take a "couple" of screws off of the metal to take the air conditioning unit apart and "help haul it away."  (AR 32.)

Plaintiff testified that he could not work anymore because of his back pain.  (AR 33.)  Medications helped "a little bit" for his back.  (AR 34.)  Side effects of Plaintiff's medications included an upset stomach and excess sweating.  (AR 34.)  Plaintiff also had asthma and depression.  (AR 34-35.)  He quit smoking three years ago, and stopped drinking four years ago. (AR 34-35.)

Due to his depression, Plaintiff did not want to function or "do anything."  (AR 35.)  Plaintiff had trouble concentrating – he would forget what people asked him to do within about a half hour. (AR 40.)  Plaintiff had trouble sleeping at night and took prescription sleeping pills, but only got four hours of broken sleep per night.  (AR 40.)  Plaintiff's doctor had told him to lose weight; he was 5'11" and weighed 264 pounds.  (AR 33-34.)

Plaintiff lived with his oldest brother.  (AR 35.)  He microwaved his own food and made his own bed, but did not wash dishes or vacuum.  (AR 36-37.)  Plaintiff watched television about six hours a day.  (AR 37.)  He had tried to use a computer, but just pushed a couple buttons.  (AR 37-38.)  Plaintiff had never been on the Internet.  (AR 38.)  He did not have a driver's license –

although he used to have one, he could not pass the eighteen-question test to renew the license. (AR 32.)  Plaintiff did not leave the house unless his brother was with him.  (AR 38.)  He had no hobbies and had not taken any long trips away from home.  (AR 39.)

### 2. Testimony of Plaintiff's Brother Wayne Fatheree

Wayne Fatheree, Plaintiff's brother, testified that Plaintiff had lived with him off and on since 1989.  (AR 41-42.)  He assisted Plaintiff with finances.  He took Plaintiff to see Dr. Morgan and Mr. Thompson, and Plaintiff was diagnosed with PTSD and mental retardation.  (AR 42-43.) He reminded Plaintiff daily to take medications.  Plaintiff could not work full time because of his back pain, and also due to his mental functioning – Plaintiff could easily be taken advantage of and coerced into things he "should not be doing."  (AR 44.)

### 3. Vocational Expert Testimony

Steven Schmidt testified as the VE at the hearing.  (AR 44-48.)  The VE testified that Plaintiff's past work included roofer and construction worker and that Plaintiff had some transferrable skills.  (AR 44-45.)

The ALJ asked the VE several hypothetical questions.  The ALJ asked the VE whether an individual of Plaintiff's age, education, work experience, and transferable skills; who could sit for six hours in an eight-hour workday; stand and walk for less than two hours in an eight-hour day; lift and carry less than ten pounds even occasionally; never climb, balance, stoop, kneel, crouch, crawl or work around hazards; and would require numerous unscheduled breaks, could perform any of Plaintiff's past work.  (AR 45.)  The VE responded that such an individual would not be able to perform any of Plaintiff's past work.  (AR 45.)

The ALJ then asked the VE whether an individual of Plaintiff's age, education, work experience, and transferable skills could perform Plaintiff's past work, assuming this person had no exertional limitations with lifting or carrying; could sit, stand or walk for six hours in an eight-hour workday with normal breaks; and could never work around concentrated fumes, odors, dusts, gasses, or poor ventilation.  (AR 45.)  The VE responded that such an individual would not be able to perform any of Plaintiff's past work.  (AR 45.)  However, the hypothetical person could perform other jobs in the California economy such as laborer, dishwasher, or hand packer.  (AR 46.)

1    In a third hypothetical, the ALJ asked whether, if the person in the second hypothetical

2    were illiterate, that person would be able to perform the alternate work identified in the second

3    hypothetical.  (AR 46.)  The VE responded that the person would still be able to perform the jobs

4    of laborer, dishwasher, and hand packer even if illiterate.  (AR 46.)

5    Plaintiff's counsel then asked the VE whether, if the same hypothetical person proposed in

6    the ALJ's second hypothetical could find or sustain any work, assuming this person could stand for

7    20 to 25 minutes or work for about 45 minutes at a time; required breaks every three to four hours

8    to lie down; had trouble concentrating; could maintain concentration only in two-hour increments;

9    had trouble withstanding stress; and had trouble following even step by step instructions.  (AR 46-

10   47.)  The VE replied that the hypothetical person could not perform any work.  (AR 47.)

11       **4.      The ALJ's Decision**

12   In a decision dated April 27, 2012, the ALJ found that Plaintiff was not disabled.  (AR 13-

13   22.)  The ALJ conducted the five-step sequential analysis set forth in 20 C.F.R. §§ 404.1520;

14   416.920.  (AR 15-22.)  At Step One, the ALJ found that Plaintiff had not worked since January 1,

15   2010, Plaintiff's alleged disability onset date.  (AR 15.)  At Step Two, the ALJ found Plaintiff had

16   the severe impairments of degenerative disc disease, obesity, asthma, mental retardation, and

17   depression.  (AR 15.)  At Step Three, the ALJ found that Plaintiff's impairments, singly or

18   combined, did not meet or equal any Listing in 20 C.F.R., Part 404, Subpt. P., App. 1 ("Listings").

19   (AR 15.)  The ALJ found Plaintiff's subjective complaints were not credible, and that Plaintiff had

20   the residual functional capacity ("RFC")[3] to perform a wide range of medium work, but was

21   limited to simple routine tasks, and must avoid exposure to pulmonary irritants such as dust and

22   fumes.  (AR 17.)  At Step Four, the ALJ found Plaintiff could not perform his past relevant work.

23   (AR 20.)   At Step Five, the ALJ found Plaintiff could perform other work that existed in

24   significant numbers in the local and national economies, and therefore was not disabled.  (AR 21.)

25   ──────────────
[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work
26   setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social
     Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an
27   individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's
     RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and
28   'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"
     *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1   The ALJ's decision became the final decision of the Commissioner when the Appeals
2   Council denied Plaintiff's request for review on August 23, 2013.  (AR 1-3.)

3        **5.      Request for Review And Evidence Submitted After ALJ's Decision**

4        After the unfavorable decision was issued in April 2012, Plaintiff sought review of the
5   decision with the Appeals Council and submitted additional evidence.  The evidence included a
6   letter from Dr. Morgan responding to the ALJ's determination regarding terminology differences
7   between the WAIS-III and the WAIS-IV tests.  (AR 332.)  Dr. Morgan explained that the
8   terminology "verbal IQ" had been dropped from the WAIS-IV, and thus he had not confused the
9   terminology as maintained by the ALJ in his decision.  (AR 332.)

10       Although the Appeals Council incorporated this evidence into the record, it denied review
11  finding that there was no reason under its rules to review the ALJ's decision.  (AR 1-5.)

12  **C.      Plaintiff's Contentions on Appeal**

13       Plaintiff states four contentions on appeal.  Plaintiff first contends that the ALJ's Step
14  Three determination that Plaintiff did not meet Listing 12.05C for mental retardation was not
15  supported by the record.  (Doc. 14-1, 11.)  Second, that the ALJ failed to provide adequate
16  reasoning for affording Dr. Morgan's opinion significantly reduced weight.  (Doc. 14-1, 17.)
17  Third, that the ALJ erred by not considering whether Plaintiff's past work was accommodated,
18  which in turn tainted the ALJ's assessments of Mr. Thompson's opinion and Plaintiff's testimony.
19  (Doc. 14-1, 21.)  Finally, the ALJ erred by failing to discuss Plaintiff's obesity in developing
20  Plaintiff's RFC.  (Doc. 14-1, 23.)

21                        **SCOPE OF REVIEW**

22       The ALJ's decision denying benefits "will be disturbed only if that decision is not
23  supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,
24  601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its
25  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).
26  Instead, the Court must determine whether the Commissioner applied the proper legal standards
27  and whether substantial evidence exists in the record to support the Commissioner's findings.  See
28  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a mere

1    scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th

2    Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might

3    accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

4    (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must

5    consider the entire record as a whole, weighing both the evidence that supports and the evidence

6    that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a

7    specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

8    2007) (citation and internal quotation marks omitted).

9                                **APPLICABLE LAW**

10           An individual is considered disabled for purposes of disability benefits if he or she is

11   unable to engage in any substantial, gainful activity by reason of any medically determinable

12   physical or mental impairment that can be expected to result in death or that has lasted, or can be

13   expected to last, for a continuous period of not less than twelve months.  42 U.S.C.

14   §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The

15   impairment or impairments must result from anatomical, physiological, or psychological

16   abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic

17   techniques and must be of such severity that the claimant is not only unable to do her previous

18   work, but cannot, considering her age, education, and work experience, engage in any other kind

19   of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3),

20   1382c(a)(3)(B), (D).

21           The regulations provide that the ALJ must undertake a specific five-step sequential

22   analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine

23   whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§

24   404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant

25   has a severe impairment or a combination of impairments significantly limiting her from

26   performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ

27   must determine whether the claimant has a severe impairment or combination of impairments that

28   meets or equals the requirements of the Listings, 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§

404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity, despite the impairment or various limitations, to perform her past work.  *Id*. §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id*. §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

### A.    The ALJ Erred in Considering Listing 12.05C

Plaintiff contends the ALJ erroneously found that Plaintiff's Verbal Comprehension Index score of 68 was invalid in considering Listing 12.05C for mental retardation.  (Doc. 14-1, 11-12.) The Commissioner responds that the ALJ properly considered whether Plaintiff met or equaled Listing 12.05C, and correctly determined Plaintiff did not establish the elements necessary to meet the Listing.  (Doc. 15-1, 6.)

### 1.    Legal Standard

The Listings set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 were "designed to operate as a presumption of disability that makes further inquiry unnecessary."  *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).  Physical and mental conditions contained in the Listings are considered so severe that "they are irrebuttably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or other jobs."  *Lester v. Chater*, 81 F.3d 821, 828 (9th Cir. 1995).

At the Third Step, the ALJ must evaluate the claimant's impairments to determine whether he or she meets or medically equals any of the impairments contained in the Listings; if any of the claimant's impairments meet or medically equal a listed impairment, he or she is deemed disabled. See 20 C.F.R. § 416.920(d).  The plaintiff bears the burden of proving that an impairment or combination of impairments meets or equals all the criteria of a Listing.  *Tackett*, 180 F.3d at 1100; *Sullivan*, 493 U.S. at 530-31 ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria  . . .  For a claimant to qualify for benefits by

showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment.") (emphasis in original); 20 C.F.R. § 416.925(d) ("impairment(s) cannot meet the criteria of a listing based only on a diagnosis;" impairments must satisfy "all of the criteria in the listing").

The ALJ must consider the relevant evidence in determining whether a claimant's impairment or impairments meet or equal one of the specified impairments set forth in the Listings. *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001); 20 C.F.R. § 416.920(a)(4)(iii). Generally, a "boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not [meet or equal a Listing]." *Lewis*, 236 F.3d at 512; *see also, e.g., Marcia v. Sullivan,* 900 F.2d 172, 176 (9th Cir. 1990) (noting that the ALJ's unexplained finding at Step Three was reversible error). However, a boilerplate finding may be appropriate where a claimant fails to set forth any evidence for the ALJ to conclude an impairment could meet or equal a Listing. *See Gonzalez v. Sullivan,* 914 F.2d 1197, 1201 (9th Cir. 1990).

Listing 12.05 for mental retardation "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  Paragraph C requires a claimant to demonstrate: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*.  "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the *lowest* of these in conjunction with 12.05."  20 C.F.R. Pt. 404, Subpt. P, Appx. I § 12.00(D)(6)(c) (Intelligence tests) (emphasis added).  The Listing explains: "For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c).  If the additional impairment(s) does not cause limitations that are 'severe' as defined in §§ 404.1520(c) and 416.920(c), we will not find that the

additional impairment(s) imposes 'an additional and significant work-related limitation of function,' even if you are unable to do your past work because of the unique features of that work." *Id*. Thus, a plaintiff meets Listing 12.05C's requirements if (1) the plaintiff has an IQ score between 60 and 70, (2) the evidence demonstrates deficits in adaptive functioning initially manifested during the developmental period, e.g. supports onset of the mental impairment before age 22, and (3) the plaintiff demonstrates a physical or other mental impairment imposing an additional and significant work-related limitation of function (i.e., a "severe" impairment).

## 2. The WAIS-IV's "Verbal Comprehension Index" Score Is Equivalent to WAIS–III's "Verbal IQ" Score

Plaintiff contends the ALJ erred in determining that Plaintiff's Verbal Comprehension Index score of 68 was invalid as a measure of "Verbal IQ." (Doc. 14-1, 16.)  Plaintiff asserts that the Verbal Comprehension Index score of the WAIS-IV administered by Dr. Morgan is the replacement for the Verbal IQ used in the previous version of the test, WAIS-III, and therefore meets the IQ element of the Listing.  (Doc. 14-1, 12.)

The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff's Verbal Comprehension score was not valid.  (Doc. 15-1, 7.)  The Commissioner argues that the disputed issue is terminology:  the verbal comprehension score that Dr. Morgan references is not a verbal IQ score.  Rather, the verbal IQ combines the verbal comprehension score and the working memory score of the WAIS-IV.  Thus, a "verbal comprehension" score of 68 is not a valid "verbal IQ" score.  Dr. Morgan's letter, submitted after the ALJ decision, does nothing to change that these two terms are not functionally equivalent.  Dr. Morgan stated only that the notation of a "verbal IQ" is out of date and that the WAIS-IV test is more sophisticated.

The previous version of the Wechsler Adult Intelligence Scale test, the WAIS-III, generated a "Verbal IQ" score by combining the scores from a verbal comprehension subtest and a working memory subtest. [4]  (AR 19.)  The WAIS-IV, however, generates what is called a "Verbal

---

[4]   Pearson, Clinical Psychology, *Wechsler Adult Intelligence Scale-Fourth Edition, Frequently Asked Questions,* http://www.pearsonclinical.com/psychology/products/100000392/wechsler-adult-intelligence-scalefourth-edition-wais-iv.html#tab-faq (last visited August 11, 2014).

Comprehension Index" based on three subtests on similarities, vocabulary, and information.[5]   The ALJ's statement that the "[V]erbal IQ *combines* the verbal comprehension score (68) and the working memory score (80) of the WAIS-IV" would be correct were the ALJ referencing the WAIS-III.  (AR 19.)  The ALJ's analysis suggests that the ALJ was not familiar with the Verbal Comprehension Index of the WAIS-IV, which was the score reported and referenced by Dr. Morgan.   (AR 295.)   Dr. Morgan's letter of October 5, 2012, stated that "verbal IQ" and "performance IQ" are terms that reference the earlier version of the Wechsler Adult Intelligence Scale, which do not have the statistical and conceptual sophistication of the Wechsler IV test.  (AR 332.)   Dr. Morgan concludes that the "essence of the concept of 'Verbal IQ' is the verbal comprehension index of the Wechsler IV . . . ."  (AR 332.)

Supporting Dr. Morgan's explanation, the Wechsler test administrators have clarified that the Verbal Comprehension Index on the WAIS-IV is to be substituted for the Verbal IQ score of the WAIS-III.  The Frequently Asked Questions section of the Wechsler Adult Intelligence Scale–IV provides insight on the use of terminology:

> Q: To meet my state's cognitive requirements for a diagnosis of  . . . mental retardation[], the [Verbal IQ]  . . . score[] must [] be below 70 points.  How do I do this with WAIS–IV, which no longer has the [Verbal IQ]  . . . composite score[]?

> A:  States and other regulatory bodies may update their terminology in the near future.  In the meantime, there is a statement on page 5 of the WAIS–IV Administration and Scoring Manual that was designed to address this situation:  "**The terms [Verbal Comprehension Index] and [Perceptual Reasoning Index] should be substituted for the terms [Verbal IQ] and [Performance IQ] in clinical decision-making and other situations where [Verbal IQ] and [Performance IQ] were previously used.**"[6]

Another Frequently Asked Question explains,

> Q:  What scores do I use if I want to do a discrepancy analysis?

---

[5] *Id.*

[6] *See* Pearson, Clinical Psychology, *Wechsler Adult Intelligence Scale-Fourth Edition, Frequently Asked Questions,* http://www.pea rsonassessments.com/hai/images/products/wais-iv/WAIS-IV—FAQ-final.pdf., at p. 5 (last visited August 11, 2014) (emphasis in original).

1    A:  The [Verbal Comprehension Index] is the functional equivalent of the [Verbal
2    IQ] . . .You should use the [Verbal Comprehension Index] . . . as you would use the
     [Verbal IQ] . . . .

3    *Id.*  Based on the Frequently Asked Questions, it is apparent that the Verbal Comprehension Index

4    of the WAIS-IV should be used to establish whether Plaintiff satisfies the IQ element of Listing

5    12.05C.

6        Although the Listings still include terminology from the WAIS-III, the WAIS-IV has *no*

7    "Verbal IQ" as referenced in Listing 12.05C.  Currently, there is no case authority in this circuit

8    considering or recognizing that the Verbal Comprehension Index score used in the WAIS–IV test

9    is the functional equivalent of the Verbal IQ score that was used in the WAIS-III.  Four out-of-

10   circuit district courts, however, have found that the two scores are functionally equivalent.  *See,*

11   *e.g., Plank v. Colvin*, CIV. 12-4144, 2013 WL 6388486 (E.D. Pa. Dec. 6, 2013); *Smith v. Astrue,*

12   No. 11-948-CJP, 2012 WL 2990064 *3 (S.D. Ill.2012) ("On [the WAIS-IV], the verbal

13   comprehension index is the functional equivalent of the verbal IQ on the earlier version, and the

14   perceptual reasoning index is the functional equivalent of the performance IQ on earlier

15   versions.");  *Martin v. Comm'r, Soc. Sec. Admin.*, CIV. SAG-12-1130, 2013 WL 4512071 (D. Md.

16   Aug. 22, 2013) ("Because the various tests have been modified since the Listings were created, the

17   'verbal comprehension index score' is the equivalent of 'verbal IQ', and the 'perceptional

18   reasoning index score' is the equivalent of 'performance IQ.'" (quoting *Green ex rel. K.C.G. v.*

19   *Astrue,* No. 09–1028, 2011 WL 1440363, at *4 (M.D.La. Feb.15, 2011), *report &*

20   *recommendation adopted,* 2011 WL 1456218 (M.D.La. Apr.14, 2011 (quoting David Weschler,

21   *WISC–IV Administration & Scoring Manual* 4 (2003)) ("The terms Verbal IQ (VIQ) and

22   Performance IQ (PIQ) have been replaced with the terms Verbal Comprehension Index (VCI) and

23   Perceptual Reasoning Index (PRI) respectively.")).

24       Dr. Morgan's discussion along with the Wechsler test administrators' explanation clearly

25   indicate the term "verbal IQ" and "Verbal Comprehension Index" score are functionally

26   equivalent.  Moreover, the Court is persuaded by the district courts that have found the two terms

27   to be equivalent for purposes of determination under the Listings.  Accordingly, the ALJ erred in

28

finding Plaintiff's Verbal Comprehension Index score of 68 was invalid by referencing the WAIS-III's formulation for a verbal comprehension score.  The WAIS-IV administrators clearly indicated the WAIS-IV's Verbal Comprehension Index score replaced the WAIS-III's Verbal IQ. The record demonstrates no other basis to deem Plaintiff's Verbal Comprehension Index score invalid.  The Court finds Plaintiff's reported Verbal Comprehension Index score of 68 meets Listing 12.05C's requirement that Plaintiff demonstrate a valid verbal IQ score of 60 through 70.

### 3.     There is Evidence Plaintiff Meets the Remaining Criteria of Listing 12.05C

While the ALJ's error in finding Plaintiff's Verbal Comprehension Index score invalid would be harmless if there were no evidence in the record to support the remaining elements of Listing 12.05C, the record here contains evidence sufficient to support a finding that the remaining elements are satisfied.  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006) (where ALJ's error lies in  failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless no reasonable ALJ could have reached a different disability determination if  fully crediting the testimony.)

Regarding the Listing's second prong requiring deficiencies in adaptive functioning, Plaintiff notes his limited schooling and the fact his work was performed under special conditions evidence deficits in adaptive functioning.   Plaintiff also urges application of a rebuttable presumption that his mental retardation began prior to age 22.  (Doc. 14-1, 12.)

The Commissioner asserts that even if the Court found the ALJ erred in interpreting the validity of Plaintiff's test results, the error was harmless because the other criteria needed to meet the Listing were never established, and other record evidence rebuts any reasonable presumption. (Doc. 15-1, 9.)

For purposes of establishing deficits in adaptive functioning *prior* to age 22, an IQ score obtained after age 22 may be evidence sufficient to apply a rebuttable presumption that the claimant's IQ deficits began prior to age 22.  This presumption is rooted in the premise that IQ, in most cases, remains fairly constant throughout one's life.  *See Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001); *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001); *Luckey v. U.S. Dep't*

1  *of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989); *Guzman v. Bowen*, 801 F.2d 723,

2  275 (7th Cir. 1986).  "[A]bsent evidence of sudden trauma that can cause retardation, the [SSI

3  claimant's adult] IQ tests create a rebuttable presumption of a fairly constant IQ throughout her

4  life." *Talavera v. Astrue*, 697 F.2d 145, 152 (2d Cir. 2012).  The reason for the requirement that a

5  claimant's disability arose before age 22 "seems intended to limit coverage to an innate condition

6  rather than a condition resulting from a disease or accident." *Novy v. Astrue*, 497 F.3d 708, 709

7  (7th Cir. 2007).  Additionally, there are other reasons why an adult would not have obtained an IQ

8  test early in life, and requiring a contemporaneous qualifying test score would present

9  insurmountable problems of proof in many cases where there is a legitimate issue about

10 intellectual ability. *Talavera*, 697 F.3d at 152.

11      While the Ninth Circuit Court of Appeals has not considered application of the rebuttable

12 presumption, several other circuits have addressed the issue.  *See Hodges v. Barnhart*, 276 F.3d

13 1265, 1268–69 (11th Cir. 2001) (IQ scores after age 22 satisfy the listing criteria and "create a

14 rebuttable presumption of a fairly constant IQ throughout life") (citing *Muncy v. Apfel*, 247 F.3d

15 728, 734 (8th Cir. 2001), *Luckey v. U.S. Dept. Of Health and Human Services*, 890 F.2d 666, 668

16 (4th Cir. 1989)).  Further, district courts within the Ninth Circuit, including the Eastern District,

17 have applied the rebuttable presumption regarding onset of mental limitations prior to age 22 in

18 some circumstances.  *See, e.g., Vieira v. Colvin*, 2:11-CV-02342 KJN, 2013 WL 1195287, at *7

19 (E.D. Cal. Mar. 22, 2013) (unpublished) (collecting cases and applying rebuttable presumption);

20 *but see, Lawson v. Astrue*, No. CV S-08-2008 GGH, 2010 WL 961722, at *5 (E.D. Cal., March

21 16, 2010) (declining to apply the presumption by distinguishing the facts and noting evidence that

22 there may have been an intervening event causing a change in intellectual functioning).

23      Moreover, deficits in adaptive functioning may be shown circumstantially through

24 evidence of attendance in special education classes, dropping out of high school prior to

25 graduation, difficulties in reading, writing or math, and low skilled work history.  *See Campbell v.*

26 *Astrue*, 2011 WL 444783 *17 (E.D. Cal. Feb. 8, 2011).

27

28

The Commissioner argues the evidence shows Plaintiff has no deficits of adaptive functioning.  For example, Plaintiff listed a 15-year period of work history, which included all phases of roofing as well as installing and removing gutters.  Plaintiff also demonstrated good abstract reasoning skills upon examination.  Although Plaintiff had limited education, he did not attend special education classes, and at one time he possessed a driver's license.  This evidence is sufficient to rebut any presumption that may apply.

The evidence both parties offer is subject to two different rational interpretations.  As the ALJ did not consider the remaining requirements for Listing 12.05C, the ALJ did not weigh or consider this evidence in relationship to the Listing.  Despite the Commissioner's interpretation of the record, there is evidence that could be reasonably viewed as establishing deficits in adaptive functioning.  For example, Plaintiff's education did not exceed second grade in public school and fifth grade through home school.  Moreover, application of the rebuttable presumption could also supply the necessary evidence showing Plaintiff exhibited deficits in adaptive functioning prior to age 22.  Whether the other evidence to which the Commissioner points could be sufficient to rebut the presumption is also a factual issue and requires interpretation of the evidence.  The Court will not weigh the evidence in the first instance to determine whether Plaintiff meets the Listing's requirements – this is the province of the ALJ.  Thus, while the Commissioner's view of the evidence is reasonable, it is not the only reasonable interpretation of the evidence; it is not an interpretation proffered by the ALJ and thus not entitled to deference.

The record also demonstrates Plaintiff had a secondary impairment that imposed an additional and significant work-related limitation of function.  At Step Two the ALJ found Plaintiff had the severe impairments of degenerative disc disease, obesity, asthma, mental retardation, and depression.  A person with a severe impairment at Step Two of the disability analysis, apart from decreased intellectual functioning, establishes this third prong of 12.05C. *Fanning v. Bowen*, 827 F2d 631, 633 (9th Cir. 1987) ("An impairment imposes a significant work-related limitation of function when its effect on a claimant's ability to perform basic work activities is more than slight or minimal."), *see, e.g., Rowens v. Astrue,* No. CIV S–09–0163 GGH, 2010 WL 3036478, at *2–4 (E.D. Cal. Aug.2, 2010) (unpublished) ("[I]n this circuit, a person who

1   has a severe physical or other mental impairment, as defined at step two of the disability analysis,

2   apart from the decreased intellectual function, meets the second prong of the § 12.05(c) listing.");

3   *Woods v. Astrue,* No. CIV S–10–2031 GEB EFB P, 2012 WL 761720, at *4 (E.D. Cal. March 7,

4   2012) (unpublished) (finding that the plaintiff met Listing 12.05C's second prong given the ALJ's

5   finding that plaintiff had "severe" impairments at Step Two).

6        The Commissioner contends the regulations have been updated since *Fanning* was issued,

7   which clarify that under 12.05C a severe impairment is meant to be defined as set forth in 20

8   C.F.R. § 404.1520(c).   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A.   Section 404.1520(c)

9   provides that "[i]f you do not have any impairment or combination of impairments which

10  significantly limits your physical or mental ability to do basic work activities, we will find that

11  you do not have a severe impairment and are, therefore, not disabled."  The Commissioner argues

12  this update to the regulation casts doubt upon the continuing vitality of *Fanning* which held that

13  "an impairment imposes a significant work-related limitation of function when its effect on a

14  claimant's ability to perform basic work activities is more than slight or minimal."  *Fanning*, 827

15  F.2d at 633.

16       The definition of "severe" provided in Section 404.1520(c) is the one which the agency

17  determines under Step Two.  The Ninth Circuit has held that under the Step Two analysis, a

18  condition "can be found not severe only if the evidence establishes a slight abnormality that has no

19  more than a minimal effect on an individual'[s] ability to work."  *Smolen v. Chater*, 80 F.3d 1273,

20  1290 (9th Cir. 1996).  Despite revision to the Listing defining "severe" as set forth in Section

21  404.1520(c), the Ninth Circuit's interpretation of a "severe" condition pursuant to Section

22  404.1520(c) remains the definition applied by the agency at Step Two – the ALJ stated here that

23  Plaintiff has severe impairments because they "cause more than a minimal loss of function,"

24  tracking the language of *Fanning*.   (AR 15.) Several district courts have rejected the

25  Commissioner's argument, holding that "a finding of severe impairment at step two is a *per se*

26  finding of 'impairment imposing additional and significant work-related limitation of function" as

27  defined in Section 404.1520(c).  *See Pedro v. Astrue*, 849 F. Supp. 2d 1006, 1015 (D. Or. 2011).

28

1    The Court is persuaded that the revision to the regulation has not affected the viability of

2 *Fanning*.  Here, because Plaintiff was found to have additional severe impairments of degenerative

3 disc disease, obesity, asthma, and depression, this prong of the Listing is met.  As the ALJ did not

4 consider or weigh the evidence relating to whether Plaintiff has deficits in adaptive functioning

5 prior to age 22, the matter must be remanded so the ALJ may consider the evidence on that prong

6 in the first instance.

7 **B.      The ALJ Did Not Properly Discredit Dr. Morgan's Opinion**

8    The parties dispute whether the ALJ offered adequate reasons for affording Dr. Morgan's

9 opinion, as an examining physician, significantly reduced weight.  (Doc. 14-1, 19-20; Doc. 15-1,

10 12.)

11    **1.      Legal Standard**

12    Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

13 who treat the claimant (treating physicians), (2) those who examine but do not treat the claimant

14 (examining physicians), and (3) those who neither examine nor treat the claimant (non-examining

15 physicians).  As a general rule, more weight should be given to the opinion of a treating source

16 than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643, 647

17 (9th Cir. 1987).  Where the treating doctor's opinion is not contradicted by another doctor, it may

18 be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th

19 Cir. 1991).   Even if the treating doctor's opinion is contradicted by another doctor, the

20 Commissioner may not reject this opinion without providing "specific and legitimate reasons"

21 supported by substantial evidence in the record for so doing.  *Murray v. Heckler*, 722 F.2d 499,

22 502 (9th Cir. 1983).   The opinion of a non-examining physician cannot, by itself, constitute

23 substantial evidence that justifies the rejection of the opinion of either an examining physician or a

24 treating physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 n. 4 (9th Cir. 1990); *Gallant v. Heckler*,

25 753 F.2d 1456 (9th Cir. 1984).   In some cases, however, the ALJ can reject the opinion of a

26 treating or examining physician, based in part on the testimony of a non-examining medical

27 advisor.  *E.g., Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir. 1989); *Andrews v. Shalala*, 53

28 F.3d 1035, 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir. 1995).

**2.      Dr. Morgan's Opinion**

In September 2011, Dr. Morgan administered to Plaintiff a series of intelligence tests using the WAIS-IV.  (AR 295-302.)  Plaintiff's scores were 68 for Verbal Comprehension, 86 for Perceptual Reasoning, 80 for Working Memory, and 68 for Processing Speed, with a Full Scale score of 71.  (AR 295-97.)

Dr. Morgan subsequently saw Plaintiff in January, February, and March of 2012.  (AR 303.)  In a Comprehensive Psychological Evaluation completed March 23, 2012, Dr. Morgan noted Plaintiff's back injury and poor memory, and opined that Plaintiff suffered from depression and anxiety.  (AR 304.)  He estimated Plaintiff's IQ was "average."  (AR 306.)   Dr. Morgan concluded that although Plaintiff had a Full Scale IQ score of 71, his Verbal Comprehension score of 68 suggested mild mental retardation.  (AR 307.)  The large disparity between Plaintiff's verbal score and his Perceptual Reasoning score of 86 also suggested a learning disability.  (AR 307.)

Dr. Morgan diagnosed Plaintiff with major depressive disorder and a learning disability, and opined Plaintiff met Listing 12.05 for mental retardation and 12.04 for affective disorder. (AR 308-09.)   He opined Plaintiff was moderately impaired in his ability to understand, remember, and perform simple one to two step tasks.  (AR 309.)  Plaintiff was markedly impaired in his abilities to (1) deal with the public, (2) maintain activities of daily living, (3) maintain social functioning, and (4) maintain concentration, persistence, and pace.  (AR 308-10.)  Plaintiff had a GAF of 50.

**3.      The ALJ's Findings**

The ALJ explained that Dr. Morgan opined Plaintiff suffered from severe depression, learning disabilities, and back problems, and could not return to work after 2007 due to progressive worsening of back pain and other physical difficulties.  (AR 19.)  The ALJ stated that, "Dr. Morgan noted the claimant had a verbal IQ of 68, but this appears to be his verbal comprehension score."  (AR 19.)   The ALJ explained he afforded Dr. Morgan's March 2012 opinion significantly reduced weight because Dr. Morgan misstated the results of Plaintiff's WAIS-IV test by confusing Plaintiff's Verbal Comprehension score with the Verbal IQ.  (AR 19.) Additionally, the ALJ discredited Dr. Morgan's opinion because it did not comport with the

evidence – it was supported by "little or no objective evidence" – and because Dr. Morgan did not treat Plaintiff.  (AR 19-20.)

### 4.     The ALJ Did Not Provide Specific and Legitimate Reasons to Discount Dr. Morgan's Opinion

Plaintiff contends that the ALJ was required to state clear and convincing reasons to discredit Dr. Morgan's opinion because Dr. Morgan was the only examining doctor in the record, and the state reviewing doctors' opinions were made without the benefits of Dr. Morgan's examinations.  (Doc. 14-1, 17-18.)  However, as the Commissioner correctly responds, the ALJ was required to articulate only specific and legitimate reasons to discredit Dr. Morgan's opinion, because it was contradicted by the opinion of Dr. Klein, who determined Plaintiff did not have a medically determinable mental impairment in July 2011.  (Doc. 15-1, 11; AR 272-84.)  In addition, in August 2011 state reviewing physician Dr. Linder affirmed reviewing physician Dr. Bell's opinion that Plaintiff lacked medically determinable impairments, except for the environmental precautions against fumes, odors, gasses, and poor ventilation.  (AR 286-87.)  Because Dr. Morgan's opinion was contradicted by others in the record, the ALJ was required to give specific and legitimate reasons supported by substantial evidence to discredit his opinion.  *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).

The ALJ's bases for rejecting Dr. Morgan's opinion are not specific and legitimate.  The ALJ rejected Dr. Morgan's opinion based on the ALJ's belief that Dr. Morgan reported invalid results of the WAIS-IV test administered to Plaintiff.  (AR 19.)  However, as discussed above, the ALJ erred in finding Plaintiff's Verbal Comprehension Index score was invalid.   As such, while specific, this was not a legitimate reason to discredit Dr. Morgan's opinion.

The ALJ also discredited Dr. Morgan's opinion because it was supported by "little or no" objective evidence.  (AR 19.)  However, Dr. Morgan provided Plaintiff's standardized testing results, a report from Plaintiff's mental status examination, and Dr. Morgan's own observations to support his conclusions.  (AR 295-310.)  Dr. Morgan discussed Plaintiff's result on the Beck depression inventory indicated severe depression.  (AR 307.)  Plaintiff's Verbal Comprehension and Processing Speed scores on the WAIS-IV were both 68.  (AR 307.)   Plaintiff scored in the

22

1  extremely low range of functioning on a different Wechsler exam, the Wechsler Memory Scale IV,

2  with scores ranging from 65-68.  (AR 308.)

3       Dr. Morgan also reported his observations from several examinations.  Dr. Morgan noted

4  that during Plaintiff's mental status examination he had poor grooming and hygiene.  (AR 306.)

5  He was cooperative but anxious.  Plaintiff often did not know the answer to a question and would

6  ask his brother.  (AR 306.)  By all appearances, Plaintiff put forth his best effort.  He had a

7  severely depressed mood with moderate restriction of affect.  (AR 306.)  His fund of knowledge

8  was limited and memory was consistent with mild mental retardation.  (AR 307.)  Dr. Morgan

9  noted that Plaintiff's calculations and concentration were impaired.   (AR 307.)

10      The record and Dr. Morgan's reports reveal that Dr. Morgan's opinion was supported by

11 standardized testing and other objective measures in the record.  The Commissioner contends that

12 Dr. Morgan's conclusions about Plaintiff's functioning are in conflict with the actual results of

13 Plaintiff's mental status examination because Plaintiff was alert and oriented to time and place,

14 could perform simple calculations, and Plaintiff's ability to reason on abstraction, similarities,

15 insight and judgment were not consistent with an individual who has severe developmental

16 deficits.  (Doc. 15-1, 11.)  However, the Commissioner's reliance on this sampling to negate the

17 results of standardized tests and other objective findings, out of many indicators of Plaintiff's

18 condition, is not convincing.

19      The ALJ does not specify to what objective evidence Dr. Morgan should have cited to

20 support his opinion.  Dr. Morgan reported multiple standardized tests in the record as well as

21 observations collected while examining Plaintiff three times.   The ALJ's assertion that Dr.

22 Morgan's opinion is not supported by objective evidence is belied by the record.  This reason for

23 discrediting Dr. Morgan was not legally sufficient.

24      The ALJ also discredited Dr. Morgan because he did not treat the claimant.  (AR 20.)

25 While treating doctors are given more weight than non-treating doctors, examining physicians are

26 given more weight than non-examining doctors.  *Lester*, 81 F.3d at 830.  Here, Dr. Morgan was an

27 examining doctor and the only doctor in the record who examined Plaintiff.  The other opinions in

28 the record come from reviews of Plaintiff's medical records by non-examining state agency

doctors – Drs. Bell, Lochner, Klein, and Linder.  While a credited treating opinion would have warranted more deference than Dr. Morgan's examining opinion, Dr. Morgan examined Plaintiff on multiple occasions, obtained a detailed history including information about his daily activities and past work, performed IQ testing, and provided a detailed report.  Dr. Morgan's report is the most comprehensive available in the record.  The fact that Dr. Morgan is an examining doctor rather than a treating doctor is not a reason to discredit his opinion, and the ALJ's statement to that effect is not a specific and legitimate basis to discredit Dr. Morgan's opinion.

In sum, the ALJ's reasons for affording significantly reduced weight to Dr. Morgan's March 2012 opinion – that the doctor misstated the results of Plaintiff's WAIS-IV testing, his opinion was supported by little or no objective evidence, and because he did not treat Plaintiff – are not specific and legitimate and supported by substantial evidence.

Regarding whether the error was prejudicial, had the ALJ credited Dr. Morgan's opinion, the ALJ may have arrived at a different result in assessing whether Plaintiff met Listing 12.05D. Listing 12.05D required that Plaintiff's mental impairments result in marked restrictions in at least two of the following: activities of daily living; social functioning; maintaining concentration, persistence, and pace; or repeated episodes of decompensation of extended duration.  (AR 16.) Dr. Morgan opined Plaintiff was markedly impaired in his abilities to (1) deal with the public, (2) maintain activities of daily living, (3) maintain social functioning, and (4) maintain concentration, persistence, and pace, which would have reached a different outcome.  (AR 308-10.)  If credited, Dr. Morgan's opinion would support a finding that Plaintiff meets Listing 12.05D.

Upon remand, the ALJ shall give renewed consideration to Dr. Morgan's opinion.  If the ALJ credits Dr. Morgan's opinion, the ALJ shall assess whether Plaintiff meets Listing 12.05D.

**C.    The ALJ's Assessment of Plaintiff's Past Relevant Work Was Proper**

Plaintiff contends the ALJ improperly failed to consider whether his past work was accommodated; i.e. he was supervised at all times, got his jobs due to friend and family connections, was permitted breaks as needed, and was not allowed to make any decisions on his own.  (Doc. 14-1, 22.)  Plaintiff argues that the ALJ was required to look at accommodation in determining whether his past work met the level of substantial gainful activity.  (Doc. 14-1, 21-

23.)  Plaintiff contends this error was harmful because the ALJ cited Plaintiff's past work as a factor in discrediting both Plaintiff's subjective testimony and the opinion of Pete Thompson, LCSW, without considering whether the work was performed under special conditions.  (Doc. 14-1, 21-22.)

The Commissioner contends Plaintiff's assertion must fail because Plaintiff worked for a number of employers, but produced no evidence in the record that he worked with an accommodation.  (Doc. 15-1, 12.)   Plaintiff described his work as requiring a variety of activities in his disability application, and his attempt to offer anecdotal evidence showing his ability to perform his past work was the result of an accommodation must fail.  *Id*.

At Step Four, the claimant bears the burden of showing that he or she does not have the residual functional capacity to engage in "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e); *Tackett,* 180 F.3d at 1098.  Work experience is considered relevant if it was done within the last fifteen years, lasted long enough for the claimant to learn to perform it, and constituted SGA.  *Vertigan v. Halter*, 260 F.3d 1044, 1051-52 (9th Cir. 2001); *see* 20 C.F.R. § 404.1565(a).  The burden is on the claimant to prove that he cannot perform past relevant work. *See Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993).

Plaintiff did not assert his past relevant work was accommodated or did not constitute substantial gainful activity in his disability application or at his hearing, during which counsel represented him.  (AR 27-47, 155-57.)  At Step Four, claimants have the burden of showing that they can no longer perform their past relevant work.  *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(e) and 416.920(e).  (Doc. 14-1, 21.)  Citing Dr. Morgan's report, Plaintiff now sets forth a variety of possible indicia that his work was accommodated, including that his activities were supervised by his brother and colleagues, he worked alongside others who provided step-by-step instructions, he was allowed frequent rest breaks, and he was given the opportunity to work due to his relationships.  (Doc. 14-1, 22.)  However, even the description of Plaintiff's work in Dr. Morgan's report did not say Plaintiff's work was performed under special accommodating conditions.

1    While the ALJ could have determined that Plaintiff's past work was accommodated, the
2    ALJ had the discretion to consider the special conditions as a factor in assessing whether the work
3    was substantial gainful activity.   20 C.F.R. § 404.1573.   Plaintiff correctly states that work
4    performed under special conditions is not dispositive, but is a factor the ALJ may consider in
5    determining whether work was substantial gainful activity.   20 C.F.R. § 404.1573.   Here, Plaintiff
6    set forth no evidence that the ALJ did not consider the nature of Plaintiff's past work, how well
7    Plaintiff performed the work, or whether the work was performed under special conditions.
8    Plaintiff did not meet his burden of demonstrating his work was accommodated in his disability
9    application, with testimony at his hearing, or through Dr. Morgan's report (AR 25-47, 155-57,
10   295-303), and the ALJ did not err by not explaining whether Plaintiff's past work was
11   accommodated.

12   Further, even had the ALJ erred, any error was harmless because the ALJ decided in
13   Plaintiff's favor by determining Plaintiff could not perform his past relevant work at Step Four.
14   (AR 20.)

15   **D.    The ALJ Properly Considered the Licensed Clinical Social Worker's Opinion**

16   Plaintiff contends that the ALJ relied on Plaintiff's performance of past work to discount
17   the opinion of Pete Thompson, LCSW.   (Doc. 14-1, 22.)   Including Plaintiff's past work as a
18   factor in affording reduced weight to Mr. Thompson's opinion is "misplaced," because the ALJ
19   failed to discuss whether Plaintiff's past work was accommodated.   (Doc. 14-1, 22-23.)   The
20   Commissioner does not respond to Plaintiff's contention.   (Doc. 15-1.)

21   The ALJ assigned reduced weight to the opinion of Pete Thompson, LCSW.   (AR 20.)
22   The ALJ noted that Mr. Thompson diagnosed Plaintiff with PTSD, dysthymia of early onset, mild
23   mental retardation, COPD, and assigned a GAF of 44.   (AR 20.)   Mr. Thompson opined that
24   Plaintiff could not work because he had great difficulty with short-term memory, could not do
25   simple math, and could barely count money.   (AR 20, 311.)   The ALJ explained that he afforded
26   Mr. Thompson's opinion reduced weight because (1) Mr. Thompson is not an acceptable medical
27   source, (2) treatment records do not support Mr. Thompson's conclusions, (3) Plaintiff had the
28   same mental conditions while he maintained gainful employment, and absent any indication that

his mental deficits have worsened since he last work, it does not stand to reason they prevented Plaintiff from working, and 4) the determination of whether an individual can work is reserved to the Commissioner.  (AR 20.)

The ALJ's first reason to afford reduced weight to Mr. Thompson's opinion – that he was not an acceptable medical source – is a legal conclusion rather than a reason for discrediting Mr. Thompson's opinion.  A licensed clinical social worker is not considered an "acceptable medical source" under the regulations.  *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223-24 (9th Cir. 2010); *see* 20 C.F.R. § 404.1513(a), (d).  The regulations treat "[p]ublic and private social welfare agency personnel" as "other sources," 20 C.F.R. § 404.1513(d)(3), whose opinions are considered in the same manner as other lay testimony.  The ALJ may expressly disregard lay testimony if the ALJ "gives reasons germane to each witness for doing so." *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001).  The observation that Mr. Thompson is not an acceptable medical source is not itself a germane reason to discredit the opinion.

The ALJ's second reason to discredit Mr. Thompson – that the treatment records do not support Mr. Thompson's conclusions – is germane.  Mr. Thompson's letter stated he saw Plaintiff 13 times between April 9, 2011, and April 4, 2012.  (AR 311.)  However, the record contains nine single-page treatment work-ups from Stanislaus County Health Services Agency, spanning from March 16, 2011, to February 9, 2012.  (AR 312-21.)  The work-ups are largely illegible and Mr. Thompson's signature is not evident on any of them.  *Id.*  The work-ups lack narrative, although some Progress Notes have diagnoses such as "COPD" or "LBP" (lower back pain) with the names of prescriptions, such as "Vicodin," following the ailment.  (AR 314, 317, 318.)  The treatment records do not support Mr. Thompson's assertions that Plaintiff suffered from PTSD, dysthymia of early onset, or mild mental retardation – those diagnoses are not discussed in the notes.  (AR 312-21.)  Nowhere else in the record are Plaintiff's PTSD or dysthymia mentioned.  The ALJ properly discredited Mr. Thompson's opinion based on the germane reason that his treatment notes did not support it.

Plaintiff contends that the ALJ's third reason for discrediting Mr. Thompson – that Plaintiff had the same mental conditions while he maintained gainful employment, and the record

offers no evidence that his mental deficits have worsened since he last worked, therefore the conditions do not prevent Plaintiff from working – was insufficient because the ALJ did not consider whether Plaintiff's work was accommodated.  (Doc. 14-1, 21.)  The ALJ is correct that, according to Mr. Thompson, Plaintiff had all of the same mental conditions when Plaintiff performed his past work as a roofer and construction worker.  (AR 311.)  It is not evident how the ALJ's consideration of whether Plaintiff's past work was accommodated would affect his ability to work the alternate jobs identified by the VE, when he had the same mental conditions during his past work.  Giving Plaintiff the benefit of the doubt, the ALJ determined Plaintiff had the RFC to perform medium exertion work, and was limited to simple routine tasks.  (AR 21.) Even had the ALJ specified that Plaintiff's past jobs were accommodated, the alternate work identified required significantly less exertion and skill than Plaintiff's past work.  All of the unskilled, medium exertion jobs identified by the VE – laborer, dish washer, and hand packer – were significantly reduced in both exertion levels and skill requirements from Plaintiff's previous work as a roofer and construction worker I.  (AR 21, 44, DICOT §§ 866.381-010, 869.664-014, 922.687-058, 318.687-010, 920.587-018.)

Finally, the ALJ's fourth reason for discrediting Mr. Thompson's opinion – because the determination of whether an individual can work is reserved to the Commissioner and not the LCSW – is, like the first basis, a conclusion of law rather than a germane basis to discredit the opinion.  An opinion that someone is not employable is an administrative finding that is reserved to the Commissioner.  (AR 28.)  *See* 20 C.F.R. § 416.927(d)(1).  Here, while the ALJ's statement was correct, it alone is not a germane reason to discredit Mr. Thompson's opinion.

For the above reasons, the ALJ stated proper grounds to discredited Mr. Thompson's opinion.

**E.     The ALJ's Assessment of Plaintiff's Credibility**

Plaintiff asserts the ALJ failed to consider whether his past work was accommodated, which was harmful because the ALJ cited Plaintiff's past work as one factor in discrediting Plaintiff's subjective testimony.  (AR 20; Doc. 14-1, 22.)  Further, the ALJ's credibility analysis was flawed because the ALJ improperly discredited Plaintiff's testimony and statements as to the

1  impact of his medical conditions on his functioning.  (Doc. 14-1, 23.)  However, Plaintiff does not

2  explain how the ALJ erred regarding the impact of his medical conditions on functioning.  (Doc.

3  14-1.)

4       As the Court remands this case for renewed consideration of the medical evidence, the

5  Court dispenses with an analysis of the ALJ's assessment of Plaintiff's credibility at this time

6  because consideration of Plaintiff's credibility is inescapably linked to conclusions regarding the

7  medical evidence.  20 C.F.R. § 416.929.  (AR 18-19, ALJ discredited Plaintiff in part based on his

8  subjective testimony conflicting with the medical evidence.)  As such, the re-evaluation of the

9  medical evidence may impact the ALJ's findings as to Plaintiff's credibility.

10 **F.      The ALJ Properly Considered Plaintiff's Obesity**

11       The parties dispute whether the ALJ properly considered Plaintiff's obesity in formulating

12 the RFC.  (Doc. 14-1, 23, Doc. 15-1, 13.)  Plaintiff contends the ALJ was required to explain the

13 effect of Plaintiff's obesity on his ability to work in developing the RFC.  (Doc. 14-1, 23.)

14 Plaintiff asserts that ALJ found Plaintiff had the severe impairments of obesity, asthma,

15 degenerative disc disease, mental retardation, and depression at Step Two, therefore the ALJ must

16 explain how Plaintiff's obesity was considered in his RFC.  (Doc. 14-1, 24.)

17       In determining Plaintiff's RFC, the ALJ noted Plaintiff's weight and height.  (AR 17.)  The

18 ALJ discussed that Plaintiff has back problems and asthma.  (AR 17.)  The ALJ noted that

19 Plaintiff reported he could lift, bend, walk, and stand for short periods of time.  (AR 18, 163-170.)

20 The ALJ discussed that Plaintiff injured his back well before his disability onset date, but

21 maintained employment without any objective evidence of a worsening of his condition.  (AR 18.)

22 Plaintiff's X-rays showed degenerative changes to Plaintiff's back, but did not mention stenosis or

23 nerve root impingement.  (AR 19, 294.)  Plaintiff had COPD, but the ALJ noted that in September

24 2011 Plaintiff's lungs were clear.  (AR 19, 316-17.)  There were no medical notes regarding any

25 cardiovascular problems.  The ALJ assessed Plaintiff had the RFC to perform medium exertion,

26 was limited to simple routine tasks, and could not be exposed to pulmonary irritants.  (AR 18.)

27       Plaintiff is correct that SSR 02-1p instructs the ALJ to consider the effects of obesity when

28 assessing an individual's RFC.    When obesity is identified as a medically determinable

1  impairment, an ALJ must consider any functional limitations resulting from the obesity in the RFC

2  assessment.  SSR 02-1p.  However, Plaintiff also has the burden to show that obesity impacted his

3  ability to work.  *Tackett,* 180 F.3d at 1098.

4       While Plaintiff's severe impairments of asthma, degenerative disc disease, and depression

5  *could* be exacerbated by obesity, Plaintiff did not set forth that obesity aggravated those conditions

6  and limited his functional capabilities.  Plaintiff did not list obesity among the physical conditions

7  limiting his ability to work on the Disability Report he submitted to the Social Security

8  Administration (reporting gall bladder problems, back, both knees, asthma, and arthritis), nor did

9  he discuss any ill effects caused by obesity at his hearing, during which counsel represented him.

10  (AR 27-47, 148-54.)  Nothing in the record indicated Plaintiff's obesity resulted in any limitations.

11  While the ALJ noted Plaintiff's obesity, the medical evidence in the record does not point to

12  functional limitations from obesity, and Plaintiff does not demonstrate any limitations from

13  obesity.

14       In light of the fact that the record failed to demonstrate that obesity affected Plaintiff's

15  functional abilities, and the ALJ acknowledged his obesity and considered the evidence in the

16  record in determining his RFC, the ALJ was not required to explicitly discuss the obesity's effects

17  in developing his RFC.

18  **G.      Remand is Required**

19       "The court shall have power to enter, upon the pleadings and transcript of the record, a

20  judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

21  with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In Social Security

22  cases, the decision to remand to the Commissioner for further proceedings or simply to award

23  benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir.

24  1989).  "If additional proceedings can remedy defects in the original administrative proceedings, a

25  social security case should be remanded.  Where, however, a rehearing would simply delay receipt

26  of benefits, reversal [and an award of benefits] is appropriate."  *Id*. (alteration in original) (internal

27  quotation marks omitted).  On the other hand, "[w]here there are outstanding issues that must be

28  resolved before a determination can be made, and it is not clear from the record that the ALJ

would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate." *Allen*, 2010 WL 4825925, at *8 (C.D. Cal. Nov. 2, 2010) (remanding the case to the Commissioner after holding that the ALJ had violated the law of the case and the rule of mandate doctrines) (citations omitted).

Here, the ALJ erred at Step Three by determining that Plaintiff's WAIS-IV Verbal Comprehension Index score of 68 was not valid, and by failing to provide specific and legitimate reasons to discredit Dr. Morgan's opinion.   The errors are not harmless because Plaintiff's Verbal Comprehension Score applies to Listing 12.05C, and may result in a finding that Plaintiff meets the Listing at Step Three.  Additionally, if Dr. Morgan's opinion is credited, Dr. Morgan's opinion about Plaintiff's impairments may result in a finding that Plaintiff meets Listing 12.05D.  The Court remands so that the ALJ may give renewed consideration to Listing 12.05C and Dr. Morgan's opinion.

### CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case is REMANDED to the ALJ for further proceedings consistent with this order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Randolph Fatheree and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **March 16, 2015**                               **/s/ Sheila K. Oberto**
                                                        UNITED STATES MAGISTRATE JUDGE

31